[Civ. No. 17272.   First Dist., Div. Two.   Jan. 15, 1957.]

FRANK ANGEL BLUE et al., Appellants, v. D. D. WATSON, as State Real Estate Commissioner, Respondent.

*Assigned by Chairman of Judicial Council.

Roy G. Hollingshead and Robert H. Kroninger for Appellants.

Edmund G. Brown, Attorney General, Carl W. Wynkoop and C. Hugh Friedman, Deputy Attorneys General, for Respondent.

KAUFMAN, J.—This is an appeal from a judgment of the Superior Court of Contra Costa County, denying appellants' petition for a writ of mandate to set aside the State Real Estate Commissioner's order revoking real estate and opportunity broker's licenses issued to appellant.

An accusation was filed with respondent Real Estate Commissioner on January 24, 1955, alleging that appellant, Frank Angel Blue, as a partner in the Doc Blue Realty, on or about December 14, 1954, received an offer for the purchase of a parcel of property together with $1,000, which sum he did not deliver to the seller and owner of the property, but commingled said sum with his own moneys and appropriated it to his own use. It was further alleged that appellant had seller's instructions prepared and delivered to the escrow holder which did not account for the down payment of $1,000, and informed the escrow holder, without the knowledge of the seller, that said sum had been paid outside the escrow, thereby causing the escrow to be closed, and an incorrect closing statement to be issued to the seller. On December 15, 1954, it was alleged, appellants obtained the signature of the seller to a deposit receipt for said sale, and did not deliver a copy thereof to the seller.

The accusation alleged that the conduct set forth above constituted violations of sections 10176, subdivisions (e) and (i), 10177, subdivision (d), 10302, subdivision (d), 10302, subdivisions (e) and (f) and 10142 of the Business and Professions Code of California, and rules 2830, 2831 and 2832 of the Rules and Regulations of the Real Estate Commissioner, title 10, California Administrative Code. After proper notice, hearing was held before a hearing officer. The commissioner adopted the decision of the hearing officer, which found the allegations of the accusation to be true and recommended revocation of the licenses. After denial of a petition

for reconsideration a petition for writ of mandate was filed. An alternative writ issued. The transcript of the proceedings and the exhibits offered and received in evidence at the administrative hearing were received in evidence. No further evidence was introduced. The trial court found that the decision of the commissioner was "not harsh, arbitrary or unreasonable, and was justified and sustained by the weight of the evidence and is not contrary to law." The petition was therefore denied.

It is the contention of appellants on this appeal, that the findings of fact of the superior court are insufficient to support the judgment denying the writ of mandate, and that the evidence is insufficient to support the findings of the court and the decision rendered by the commissioner.

The complaining witness was James M. Fritchman who described himself as a "marine engineer and divine healer." He had known appellant, Frank Angel Blue (also known as Doc Blue) for about three years prior to December 14, 1954, the date on which appellant called him to tell him he had a cash deal on his house for $9,000. He called at the office and learned that a $500 deposit had been made. However, he demanded a $1,000 deposit. He signed the deposit receipt in appellants' office. Subsequently the $500 was changed to $1,000. When he asked for a copy of the deposit receipt, he was told that he did not get one. A few days later appellant Blue called to ask him if he needed an advance. He went to appellants' office, signed a receipt and received $150, but did not get a copy. This was the first money which he had ever received from Blue. He received another advance of $250 before Christmas, 1954, and signed another receipt. His wife was not present at this time. On January 12, 1955, appellant came to his house, and they went to the bank where he received $5,016.74. Appellant had another check for Fritchman in the sum of $730 from another transaction. Blue produced a typewritten receipt which Fritchman signed. The receipt recited that complainant had received of Blue all moneys due him from the sale of his corner property. It stated further "I have also reimbursed Dr. Frank A. Blue the sum of $400.00 borrowed by me during the sale of said piece of property. Said loans were in the sum of $250.00 and $150.00." The next paragraph reading, "I make no further claims for money due me on this transaction, having received all monies due me," complainant said, was then not on the receipt. Later, on January 13, he added in handwrit-

ing, "This is $730 check from the title co. & $5.076.76 check." The check for $730, he said, was made out to appellant, who indorsed it. It was cashed, the $400 owing for the advances was deducted, and he received $330. When he asked appellant for a closing statement he was told that appellant had not received one.

Shortly thereafter, complainant realizing that he was $1,100 short on the deal, went to the title company, where he learned that according to their records that $1,000 had been paid outside the escrow. He demanded the $1,000 from Blue, who claimed that he had already given it to him in cash. Appellant then offered to sell a parcel of property for the witness without a commission. When appellant said he intended to do nothing about payment of the $1,000 complainant brought charges against him.

Fritchman also testified that he had added the handwritten sentence to the receipt because "I knew this other was a phoney deal, and I assumed that all this is the money from the escrow when I signed that."

On cross-examination Fritchman denied that he told Dermody, the deputy Real Estate Commissioner, that there had been no indication of down payment on the deposit receipt when it was presented to him. (Mr. Dermody had testified that complainant had stated to him that "there was nothing there at the time he signed.") He stated that if he had received the $1,000 he would not have accepted the advances of $400. After he realized that he was $1,100 short he went to the title company, then called on appellant who told him that he had put the $1,000 in complainant's pocket. He first saw the added typed sentence on the receipt when it was shown to him at the office of the Real Estate Commissioner.

Ted Lowen, manager of the title company, testified that the $1,000 showed on the buyer's instructions, and that the title company was advised by appellant that said sum had been deposited with the broker. The title company was informed by appellant's office that the $1,000 had been paid to the seller. Such notations were made on the buyer's instructions on January 10, 1955. Seller's instructions showed a commission of $900 paid to appellant, and $1,000 paid to seller. The person in the title company making up the closing statement had noted the shortage of $1,000, and was then informed by appellant that this had been paid to the seller outside of the escrow. A week after closing, complainant came to see the

files. The witness called appellant, who said he had paid complainant, that complainant had accepted the check and had made no complaint. He had had several dealings with appellant whom he knew only through business. His reputation was good, and he would not question his word.

Appellant Blue, testifying in his own behalf stated that complainant was always secretive about his real estate transactions trying to keep the information from his wife. Appellant had made several sales of real property for him prior to this transaction. On the day following the $1,000 deposit by the buyers, complainant wanted an advance. Although the transaction was not closed, he said that he paid the $1,000 to him, and it was paid in cash at his request in the presence of complainant's wife and Mr. Anderson, a salesman in the office. No receipt was made out by appellant. Complainant had asked Blue not to let his wife see the transfer of the funds when he handed him ten one-hundred dollar bills.

On cross-examination Blue testified that the deposit receipt was changed to $1,000 when he presented it to the buyers before they signed it and gave him the check. When Fritchman called him, he had the buyer's check on his desk, but Fritchman said he wanted cash. He informed him that the proper procedure was to put the money in a trustee account, then draw a check. He went to the bank, cashed the check, and when he returned, Mrs. Fritchman was in the office. He handed the money to complainant while his wife was talking with someone else. He asked him to count it, but complainant grabbed it and put it in his pocket. It would have made it too obvious if he had made out a receipt. Appellant knew of Fritchman's reputation as a healer and his bad financial reputation but had no reason to distrust him. Although the salesman, Anderson, was in the office at the time, he didn't think it important to get him as a witness.

In answer to questions by the hearing officer, appellant said that he kept no records of the $1,000. He did mention it to his partner, but she made no record of it. Although he admitted that it would have been good business for him to have made a record of the receipt of this sum, he did not because of Fritchman's secretiveness. He had forgotten about Anderson's presence in the office at the time of the transactions and was surprised when Anderson reminded him that he was present. He remembered a notation about the $1,000 he had made for his file, but didn't mention it at the meeting in the commissioner's office.

A continuance was granted so that appellant might subpoena other witnesses.

Complainant was again examined at the second hearing. He stated that no loans had been made to him by appellant Blue except those for $150 and $250, which his wife knew about. The only thing he didn't want her to know about was the foreclosure of their home. He did not tell appellant not to tell his wife about the loan. The only time his wife had been in the real estate office was the occasion when the seller's instructions were signed.

Appellant brought a notation which he had made concerning the $1,000 to the hearing. He said it had been in the Fritchman-Combra file immediately after he had given Fritchman the $1,000. A letter from his partner was introduced (Ex. D) showing that the usual office procedure was to issue a duplicate receipt when a deposit from a buyer was received, deposit the money in a trust account where it would be held until the deal was consummated. There was nothing in the records showing a receipt to the purchasers for the $1,000. Although his partner was absent from the office between December 8, 1954, and January 2, 1955, and although he did deposit money and give receipts for other accounts, he did not in this case because he expected her back momentarily.

The salesman, Anderson, testified that he knew about the deal. He saw Blue give Fritchman money in the office, but could not say if it was $1,000. Fritchman came into the office three times, once getting $150 and another time $250. He thought those loans were before the sale. His desk was in front of appellant's, but he was standing at the filing cabinet when the money was exchanged. He saw one hundred dollar bills, the top bill was $100, but he couldn't say whether the total was $200 or $1,000. He was four or five feet from them and Fritchman's back was toward him. He had not seen the $1,000 check. Appellant only discussed the matter of the $1,000 with Anderson after the complaint had been made. Anderson had seen receipts for the $150 and $250 loans, and said they were written on title company paper. One of them, Exhibit "B," was on cardboard with no title company heading. Anderson then thought he had better change his testimony, that these things were none of his business.

Inspector Stoffel of the Contra Costa Sheriff's Office called

by complainant, testified that when he called on appellant he told him that when he advised Fritchman of the $1,000 deposit, Fritchman wanted it in cash. Appellant went to the bank, cashed the checks, and handed the money to Fritchman. At a later time appellant and Fritchman went to the bank when the checks for $5,076.76 and $730 were cashed. There Fritchman paid off the $400 owed on the loans. Testifying from his recollection and notes he had taken at the time, he stated that he had never heard that the $1,000 was paid to Fritchman by appellant in his office.

The trial court found that the allegations of Paragraphs I through XIII, and XV and XVI of the petition were true. These allegations recited the steps that had been taken in the administrative proceedings, the preparation of the record, and such matters. The court found that Paragraph XIV was true (that petitioners have no plain, speedy and adequate remedy at law) except that the decision rendered by the respondent "is not harsh, arbitrary or unreasonable, and was justified and sustained by the weight of the evidence and is not contrary to law." Paragraphs XVII, XVIII, XX, XXI and XXII were found to be untrue. These paragraphs alleged that the evidence was insufficient to sustain a conviction under certain sections of the Business and Professions Code and the Rules and Regulations of the State Real Estate Commissioner (the sections mentioned in the accusation); that petitioners were denied due process in that respondent made his decision on evidence not presented at the hearing; that appellants will suffer irreparable injury; that respondent's act was arbitrary, capricious and an abuse of discretion; that there is no substantial evidence to support the findings of respondent commissioner numbered V, VI, VII and which were quoted in Paragraph XX of the petition. Paragraph XIX was found to be untrue except that it is true that petitioners cannot carry on their business as real estate or business opportunity brokers without licenses.

It is to be noted that appellants offered no further evidence in the superior court in proof of the above allegations. There was no proof that the commissioner had relied on evidence outside the record. Section 1094.5, Code of Civil Procedure provides that where it is contended "that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court

determines that the findings are not supported by the weight of the evidence.''

The case of *Cooper* v. *State Board of Medical Examiners*, 35 Cal.2d 242 [217 P.2d 630, 18 A.L.R.2d 593], a case involving the revocation of a license by the Board of Medical Examiners, is of interest because the findings in that case appear to have been drafted in a similar manner to those herein. The review by the trial court in that case required the court to exercise its independent judgment and determine whether the findings of the board were supported by the weight of the evidence. The opinion therein recites (p. 244) that ''The superior court, after a hearing but with no other evidence than the transcript and record of the proceedings before the board, found and concluded that the 'findings and order of respondent Board revoking petitioner's license as a drugless practitioner were . . . supported by the findings of respondent Board; that the findings of respondent Board, were, and are, based upon and supported by the weight of the evidence,' and that the proceedings before the board were within its jurisdiction and were conducted 'without procedural and prejudicial error or abuse of discretion of any kind.' '' There is no attack in this case upon the form of the findings, and the court was able to conclude from them that the trial court had exercised its independent judgment and had in effect adopted the board's findings. The findings herein that the decision of the respondent is justified and sustained by the weight of the evidence certainly demonstrate that the trial court has exercised its independent judgment, and has itself weighed the evidence; otherwise, it could not have made this determination. In the cases of *Davis* v. *State Board of Optometry*, 35 Cal.App.2d 428, 433 [95 P.2d 959] and *Beloin* v. *Blankenhorn*, 97 Cal.App.2d 662, 664 [218 P.2d 552], cited by appellants, no findings whatever were made by the trial court.

Appellants attack the findings that the allegations of Paragraphs XVII, XVIII, XX, XXI and XXII are untrue as constituting negative pregnants and argue that such findings have been criticized as inadequate. In the case of *Mardesich* v. *C. H. Hendry Co.*, 51 Cal.App.2d 567, 575 [125 P.2d 595], from which appellants quote, the finding that certain allegations were untrue left it uncertain whether or not the plaintiff might have been contributorily negligent for the court found an affirmative defense untrue which alleged that the accident

was proximately caused by the negligence of plaintiff, which could mean that it was not proximately caused solely by plaintiff's negligence. The court there stated, however, that such finding would not be fatal to the judgment if there had been a finding on the ultimate fact negating the existence of negligence on the part of plaintiff which contributed as a proximate cause of his injury. In the instant case the court's findings that the allegations are untrue which state that the respondent commissioner's findings set forth therein are not supported by substantial evidence, leave no uncertainty as to what the trial court found in regard to them, for if the allegations are untrue, then said findings are supported by substantial evidence. ■ It has been held that the criticism that such a finding constitutes a negative pregnant is without merit, for that rule applies to ''pleading, not to findings, which are to be construed so as to uphold the judgment if they are reasonably susceptible of such a construction.'' (*McAuliffe* v. *McAuliffe*, 53 Cal.App. 352, 355 [199 P. 1071]; and see *Johndrow* v. *Thomas*, 31 Cal.2d 202, 208-209 [187 P.2d 681]; *Stevens* v. *Stevens*, 215 Cal. 702, 705 [12 P.2d 432]; *Tobola* v. *Wholey*, 75 Cal.App.2d 351, 358 [170 P.2d 952].)

It has been held in *Moran* v. *Board of Medical Examiners*, 32 Cal.2d 301, 308 [196 P.2d 20], that when the appellate court reviews this type of decision by the superior court, the usual rule on appeal applies, that is, all conflicts are to be resolved in favor of respondent, and all legitimate inferences indulged in favor of the judgment. The only question to be decided is whether or not there is substantial evidence to support the decision of the trial court. Therefore, even though the trial judge in such a case must decide as to the weight of the evidence, this court only inquires whether there is substantial evidence for his decision.

■ The question here, was chiefly one of credibility. If the trial court believed the testimony of the complainant then it could conclude, as it did, that the weight of the evidence supported the decision. There is substantial evidence in the record to support such a belief. A reading of the testimony set forth above convinces us that the testimony of the complainant is not inherently incredible, and that there are serious inconsistencies in the testimony of appellant Blue and his witness Anderson. This court cannot make a new determination as to which witnesses were most worthy of belief. (See *Whitcomb* v. *Emerson*, 46 Cal.App.2d 263, 270 [115 P.2d 892].)

In view of the foregoing, the judgment must be affirmed. Judgment affirmed.

Dooling, Acting P. J., and Draper, J. pro tem.,* concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 13, 1957.

*Assigned by Chairman of Judicial Council.